Alright, the next case we're going to hear this morning is W. C. English, Inc. v. Rummel, Klepper & Kahl, and Mr. Paul, whenever you're ready, we'll hear from you. May it please the Court, I'm Dustin Paul, here on behalf of W. C. English, and at the top of the table with me is my law partner, Jim Harvey. We're here because the trial court erroneously entered summary judgment in favor of both defendants in this case. We believe that judgment was incorrect, but the reasons the judgment was incorrect differ between the two defendants. Regarding the first defendant, which we'll refer to as R. K. & K., the trial court entered an erroneous summary judgment decision because it misinterpreted the party's contract, specifically part of the indemnification provision between W. C. English and R. K. & K. The court, contrary to a wealth of authority and the basic meaning of the terms within the indemnification clause, found that it created some sort of contributory negligence scheme. Rather than as eight other state courts have found, it creates, by using the word extent, a comparative negligence scheme. With regard to the other defendant, C. D. M. Smith, it's more of a classic summary judgment problem. The trial court failed to give all disputed facts in favor of W. C. English and failed to give all reasonable inferences in favor of W. C. English instead. On appeal, of course, both of those issues are considered de novo. With the court's permission, I'd like to address the R. K. & K. issue first and talk about the contractual link. Do you concede that your client was negligent? For purposes of this appeal, I don't think there's any value for us to examine that issue. We may certainly argue before a jury that we had no negligence or negligence was inconsequential. You know, the negligence, you guys discuss negligence and the contracts have provisions talking about negligence on the one hand and failure to perform on the other. But in many cases that we have had over the period of years I've been here, we have rejected the notion that we adopt a negligence standard when we're talking about the performance of a contract. Now, if a subcontractor backs his bulldozer over a fellow contractor, there's a negligence issue. But if somebody fails to conform to a spec, that's not a negligence issue, it's a contract issue. Now, the contract does distinguish in this case. And I wouldn't even call it a contributory negligence or comparative negligence. You can use that as a metaphor, but it seems to me the right approach in this case, it's all non-performance. There's no negligence issue about some duty independent of the contract. I think that's correct. There's some confusion here because... There's a lot of confusion. At least one of the provisions uses the word negligence as to one of the parties. But fundamentally here, what we're talking about is performance or non-performance of the contract. And here, it's clear that what the parties adopted was a comparative scheme in which their respective faults would be allocated. And they'd have to pay to replace any work that the VOT found non-compliant according to how much fault each of the parties have. And we get to that by the basic language of the identification provision. Which provides that the identification obligation exists to the extent of the negligence or the fault of R, K, and K. But not to the extent of the fault of WC English. So the district court thought, you know, maybe so if you just look at that one provision. But that if you look at the three things that R, K, and K marked up, it seems clear that on the other two, there's no comparative inquiry. Being required. And so why would this one have been different? What's the reasoning for why the parties would have agreed? We want something more like contributory negligence under the first paragraph and the damages provision. But on this one in particular, this one we want something more comparative. I think the answer to that, and we try to address this in the brief by talking about the Virginia Supreme Court cases. The answer to that is there's a difference in the basic insurance structure that's behind these two types of losses. With regard to personal property damage, with regard to personal injuries, with regard to wrongful death. Those are the type of claims that are handled under a comprehensive general liability policy. Those are things that every contractor and subcontractor has insurance in place for. So when you allocate those risks under an identification provision, what you're really allocating is who's going to pay those particular insurance premiums. And whose insurance is going to have to step up and defend a claim that somebody was injured at the job site. And which insurance company is ultimately going to have to pay that liability. It's a different situation when you address, as this does in paragraph two of section 11, what is a contractual performance issue. With some exceptions, very few parties actually carry insurance on that. What you're usually allocating there is who's going to take the hit to the company's actual bottom line. Who's going to have to pay out of pocket, who's going to have to pay that year's profits towards, in this case, rebuilding a bridge on I-81. And it's completely reasonable that the parties would look at that and say, well, we're willing to put in our portion of redoing that work. For whatever degree of fault or negligence was on us, we will pay that. But what we're not doing is going to identify you for 100% if we were only 3% responsible. And I think because of that, it makes sense that the parties would adopt different schemes to deal with that. And contrary to the district court, I think the fact that the parties use different words here, use different contractual clauses, is actually an indication that they wanted to treat these issues differently. If they wanted personal injuries to be treated like insufficiency of contract performance, all you'd have to do is take that language from the first part of paragraph of section 11 and just move it down to the second part of section 11. But that's not what the parties did. In fact, according to the records we cite in the brief, what happened was they went in and actually interlineated the identification provision to add in the structure that talks about to the extent of one party's negligence, but not to the extent of the other party's fault. And what this is reflective of is eight of the cases that we cite to the court in which courts have looked at similar provisions before and said, when you use the word extent, you're trying to measure. You're trying to tell the size of something. You're trying, in this provision, to compare something, which is the relative fault of the two parties. So I think here, yes, I think it's clear in the first part of section 11 that the parties were trying to do something akin to contributory negligence. WC English was only indemnified to the extent that they were fault free. But they're doing something completely different in the second part of that paragraph. I think you say in your brief, if I'm remembering right, that if we thought it were ambiguous, then it would be a question for the jury. But if we thought it were ambiguous, isn't there also a canon that then we should construe it against the drafter? Well, it's unclear here who the drafter was. That's what I was going to ask you. Why is that? Here, the interlineations, and I believe we cite to the specific record page, were made by, I believe, counsel for RK&K. So why aren't they the drafter of the language that's ambiguous? You could certainly reach that conclusion. What's the argument that they're not? I think there's a little ambiguity because the contract itself came from us. But the actual language, to the extent that was adopted, was language, as I understand the record, that was proposed by RK&K. Okay. And ambiguous, I will just point out, there are three other of your sister courts who have also considered similar language, talking about the extent of negligence. They have all concluded that in those three cases, the language was ambiguous and that it was appropriate to go to a jury in that situation. Well, it seemed that it would have been RK&K because there are no changes for CDM, just your boilerplate. That's correct. If there aren't any further questions on RK&K, I'd like to take the opportunity to talk briefly about CDM Smith. As I said before, this is more of a classic summary judgment problem. And here, I think it's important to focus on the standard before this court. I certainly don't expect this court to blame CDM Smith for 100% of the problem that occurred. I'm not even sure what percentage the court will decide. But the question before this court and the question that should have been before the trial court was, any reasonable juror who takes every inference and takes every fact in WC English's favor, can they assign any portion of the blame, regardless of how small, on CDM Smith? If you look at the facts in this case, I think the answer, we'll certainly argue to a jury, is that you can assign at least some of that fault to CDM Smith. And here's what we know. We know that CDM Smith specifically stopped WC English, who was correctly building the bridge, and told them to do it the wrong way. That fact alone should be dispositive. But we've got other facts in the records. We know that on the 21st of April, three days before the concrete was locked in place, at least as my opponent's telling the story, that the bridge inspector for CDM Smith knew that there was a nonconformity. But rather than raise his hand, raise his flag, and say, guys, we need to redo this entire work again, he simply notes that we should recheck the spacing. He doesn't say anything's wrong. He doesn't say it's noncompliant. He simply states, recheck the spacing. Is it, is it, I have a question about this. It wasn't clear to me that it was CDM's job to say what conformed and what didn't. I thought that was what R.K. and K. did, that CDM sort of measured it and said, here's what it looks like. And then it was up to R.K. and K. to figure out whether or not that conformed to the specifications. Is that not right? I disagree with that. Certainly their primary job is, is as measurements. But they have an additional job, and it's laid out in Part 4 of the QAQC plan of what they need to do when their measurements reveal that there's a nonconformity. So they, they have their own independent responsibilities. And they've got their own independent. But how do they, but I thought that, how do they even know? I thought R.K. and K. were the people who sort of had, I mean, I have a very rudimentary understanding, but I'm sort of picturing they're the ones with the expertise and the drawings. And so CDM goes to them and says, this thing is three inches big. That's all we know. And then R.K. and K. figures out, well, does the plan call for three inches or is the plan supposed to have something bigger? And so they report up through R.K. and K. They do report up through, but they've got their own independent obligations to evaluate whether it's compliant or not compliant. And I point the court actually. Are those three levels, levels one, two, and three imposed on CDM Smith? I would say no, Your Honor. Those are part three of the plan. That's the QA section. Those are really focused primarily on R.K. and K. It's part four that's drafted by CDM Smith that's supposed to lay out their primary responsibilities. And what's the duty if they see noncompliance? They find the measurements out. What is their duty? Under the documents. Their first duty is to try to notify the people on the ground and get it fixed immediately. Failing that, they need to report a nonconformity to W.C. English's construction manager and file a nonconformity report if it's not being fixed. Did they do that? They did not. And that's why we're here. The court doesn't have any other questions. I'm happy to address them on briefs. Thank you. Mr. Bayless. May it please the court, my name is Bill Bayless. I'm here with my partners, Brendan O'Toole and Joseph Cove on behalf of R.K. and K. R.K. and K. was the QA inspector on this job. This is a bridge job,     It's a bridge job. It's a bridge job. It's a bridge job. It's an on-page, some-page contract. And when you start with the position that these are sophisticated parties negotiating the contract, and Judge Hollander mentioned about a bullet-plate contract that wasn't changed, R.K. and K. was presented with a contract that was not acceptable to them. R.K. and K. would not accept the allocation of risk as a QA inspector and be responsible and a guarantor of the work of English. English was the general contractor. It was English's job to perform pursuant to the terms and conditions of the contract and to deliver pursuant to the plans and drawings. So when you start from the beginning when this contract was entered into, they, like C.D. and Smith, are presented with this 70-some-page document and they made changes. They carefully reviewed and we will not accept the contract as presented. So what did they do? And if you look... Who are you referring to as they? Your client? What did R.K. and K. do? Oh, okay. I'm sorry. And you agree that these changes were interposed by R.K. and K.? That's correct. The bullet-plate was... and I will also point out not only were they made by R.K. and K., every one of them was accepted. Do you... just to see if we can cut through a little bit and get agreement, do you suggest then that because this was a negotiated contract between two parties, each of which contributed provisions, we don't apply the canon that is strictly construed against one party or the other? My position, Justin, to answer that is I understand the question that was asked earlier that it would be construed right after the contract. Each side did, in fact, put in... No, but that canon applies generally when a contract is designed by one side and presented to the other side and the other side signs. But here, as you point out, there was negotiation. There was an unwillingness to accept the contract as originally written and there were changes made, which is an indication that this is more bilateral than it should be. What's interesting is go back to the time the contract was drafted and the roles of the respective parties being involved. When they made the changes, English accepted every single one of the changes. There's no further negotiations and signed the contract. Well, those changes, just as a matter of a side, it gets back on my thesis that it is terribly confusing to discuss negligence duties in connection with the performance of a contract. Negligence duties do exist on the site. People who are negligent have responsibilities. They carry insurance and so forth. Most insurance companies won't insure the actual performance of the contract. And yet the clauses, as you started out, were negligence in one paragraph and performance in the other. But the second paragraph of paragraph 11 starts out addressing performance deficiencies and assessment of performance. But yet the change your client made was to the extent directly caused by negligence of subcontractor. That really should have been said by the nonperformance of subcontractor. So you're mixing negligence concepts with nonperformance concepts. I must say, I think if you were really going to construe these contracts, literally neither party would be very happy. Well, this is a contract case. It's not a negligence case. I understand it is. So in response to what you just said about by using the words negligence as the performance. Well, I'm looking at the change written by your client. And I understand what you're talking about. And I'll deal with that out of the context of my argument. I'm not sure you can deal with it. In other words, it says it imposes nonperformance liability. And then you add to the extent directly caused by the negligence of subcontractor. So the question is to the extent caused by the negligence. We're talking about nonperformance caused by the negligence. Now, that's a strange concept. I think it looks to me if I were reading it casually, it looks to me like that's intended to apportion nonperformance between the parties to the extent that their nonperformance, they're responsible for the nonperformance. But if you look at the entire language in there. Well, I did. That's what I was, that's what I seemed to glean from that. Right. Well, if you see what they drafted and I think it's important and I think it was pointed out by Judge Moon as well when he analyzed the issue that you're talking about in that particular provision that if you look at that language it says to the extent directly caused by the negligence of subcontractor. That's R, K, and K. The word directly was used there. Yeah, but that's approximate cause and notion for negligence. That's a strange concept too to apply when you're talking about nonperformance. Nonperformance is a failure to conform to the contract. Right. I didn't, they called for 10 inch beams and I put in 8 inch beams and that's nonperformance now. Whether that's caused     is to pay the damages for the nonperformance and I've assumed that these clauses even if they're not in the statute they're not in the statute and they're not in the statute and as amended by your plan was intended so that you wouldn't be a guarantor of all deficiencies of performance but that each party would bear its responsibility in that regard and that's and the district judge seemed to read it that way in one provision but then said there's another provision that seemed to be in tension with it and then it started applying cannons and resolving those tensions and that's that gets into dangerous territory. I mean it's now resolved. It's finding an ambiguity and trying to resolve the ambiguity itself. And he dealt with that on pages Well I know he did. He spent a lot of time on that. And he did and there are really three provisions. Maybe the jury should have done that. Well from a contractual context if you look at all three of the provisions you see what the intent of the parties was. Except that if you read it carefully the provisions address different circumstances and what your briefs both you and the other side were is the notion of negligence and the notion of non-performance and in doing so you then denude these provisions of their intent original purpose. Even the changes    I found this all pretty messy. Well again when you use the word negligence and the notion of non-performance and the notion of non-performance and the notion of non-performance and they use the word negligence there and if you fail to conform you know you're not following the standard you are negligent when you do what you did. But the law does not impose a duty of negligence in failing to perform as specified or as agreed. The law imposes contract damages and assesses liability based on that basis. There's a whole doctrine involving negligence and we have contributory negligence comparative negligence we have duty of safety duty of tort duty and everybody at the job site has tort responsibilities. They can be negligent. The crane can fall and injure people or can damage the bridge. Those are negligence issues. The issues in this case as I understand it are singly and solely nonperformance. And what Judge Loon did he didn't create a tort standard here. If you read the language what he did in this case and applying the language in the contract Well he imposed he said there's a contributory negligence standard. He resolved these tensions in the contract and says the contract creates a contributory negligence thing and since and since English was negligent there can be no recovery. Does that make sense? Well I think what he did was use the contributory negligence and the comparative negligence as an analogy to what was intended They could have but that isn't what led to. What did he conclude after he said this is contributory negligence provisions the contract imposed contributory negligence regime what did he then conclude? He concluded that English was responsible and he did not assess whether you guys were responsible at all because it was irrelevant. That's exactly what he did and when he did it   he looked at all the responsibilities by all three. And I think what Judge Moon did when he made the decision that he did was look at all three of the provisions and not just a half of a sentence by itself and he harmonized that as we said in our brief. He did a lot of harmonizing no question about it but my question then is if he's to read this whole contract between contractor and subcontractors basically if English has any responsibility for some of the nonperformance then that frees up all the contractors from any defalcations. And I just don't believe the contract says that. In response to that one specific point that you made if you look at what they did they struck the word sole negligence out of English's responsibility. These parties didn't have to agree to a nonperformance on the job. It's understood every contractor knows it. You have to provide insurance for the negligence. The provisions are all thought out. They've been negotiated. In my judgment the attorneys who got involved in this type of scheme then you're suggesting that if English failed to do part of its duty in the performance and if the two subcontractors also failed substantially to do what they were supposed to do English has to bear the whole responsibility. That's the conclusion that your argument leads to. My argument is that those words were drafted so that we did not become the guarantor of their performance. Of course not, but how about your own performance? What if you and C.D. Smith failed to do certain things when they discovered the improper construction? They had responsibilities, the quality control agreements imposed responsibilities, there were reporting requirements, there were recording requirements, and VDOC had to know something along this line on something this serious. Now, none of those reports were generated, and the question is it's not solely English's problem. You guys were hired to do something. There's no question we were hired to do something. Except if you're saying that if English had a little bit of nonperformance they could have solved the whole thing, then you guys are off the hook, even though you guys didn't breach your requirements. If that's not in accordance with the specs, and they say do it anyway, then you have to report it to the construction manager and the Virginia Department of Transportation. That's under the agreement. And you didn't do it. Well, in this particular factual situation, you've got a three-quarter inch cover issue, which you have. And what happened here is, and you have to look at Mr. Plott's affidavit, and that's what Judge Moon looked at for certain, and that is that they failed to process the RFI, and their own people testified unequivocally that they expected them to process it, thought they had processed it, thought it had been approved. And that's what this contract is drafted to protect against, is where English, in this particular case... Except the contract imposes specific duties on your client... Yes, and if you find something out of spec, you have duties, and those duties clearly were not followed. Now, English could be wrong in telling you to do it, and they bear responsibility too. They say do it. As a matter of fact, there's some dialogue I read in one of the transcripts where the guy said, go ahead and do it. You're not running the job or something like that. It's mixed testimony, incidentally, on all this, who's responsible, who's said to go it. I don't think there's any clear result, but the specs were not correct. In that case, the ultimate duty is imposed on  contractor to process that RFI, which they failed to do. That's not the ultimate duty. The ultimate duty for you is to report it to the contract manager in writing, and I think you have a duty to go to the  manager and report it to the contract manager. I don't know where in the contract. I can't answer that question. I don't know. It's not in the quality control agreement? It would be the quality assurance. Quality assurance. There's an overall agreement. Let me ask you this. Did you in any circumstance, in any circumstance, your client have a responsibility to report to Virginia Department of Transportation with respect to gross nonconformance with specs? I cannot point to the contract where we did, but to answer your question. You at least had a duty to report  Department of Transportation with respect    specs. I can't answer that question. I can't answer that question. I can't answer that question. I can't answer that question. I can't answer that question. I didn't have a duty to report Department of Transportation with respect to gross nonconformance with specs. I don't have a responsibility to report it. I don't have a duty to report Department of Transportation with respect to gross nonconformance with specs. I have a duty to report   government and continue to do that. I don't have a duty to report that. I don't have a duty to report that. I don't have a duty to report that. I have a  report that. It is not my  to contribute   name. I have a duty to to report that. That's my duty to report that. Thank you sir, thank you. Good morning your honor. Smith please the court. Jason Smith on behalf of CDM Smith. I also have with me my colleague Anthony Blanco he's also on the briefs. I agree with the fact that there are contractual obligations. And the undisputed evidence below is Let me ask you just going to that what were the responsibilities of your client if it knew of a failure to follow spec and believed that specs were not being followed in the QAQC  What was the responsibility imposed on your client for that? The contractual  with respect to quality assurance and quality control on this project are set forth in what's called the QAQC plan. I know but you're not answering my question. I want to say just CDM Smith, if it knows that specs are not being followed, what do you impose on CDM Smith specifically? And the reason why I was going to the QAQC plan is what we had to do contractually depended upon the level 3 nonconformity. Make the level 3. If it was a level 3 nonconformity, which there is no evidence in the record to suggest that it is. Make it a level 3. We can go hypothetical this time. I just want to know what your duty was. Sure. If it was a level 3 nonconformity, we had an obligation to notify the quality assurance manager, who at the time of this was Richard Clark of RKNK professional engineer, and we had an obligation to notify WC English. English or some particular person? WC English. You didn't have a duty to notify the construction manager? There is conflicting language in the contract. The construction manager at the time is ambiguous. There is no evidence in the record to suggest exactly who that individual is. I'm not asking that. I'm asking for the contractual duty. Let's stick just with the construction  There is a portion of the contract that says it has to go to the design management and there is a portion of the contract that says construction manager. If you don't perform on both, you say there is a tension between the two? Correct. One way to comply is to notify both, right? Well, that would  comply if it were a level 3 non-conformance report. That's my hypothetical. And I understand. Okay, and that had to be in writing, right? It eventually had to be reduced to an NCR, a non- conformance report, which would then get transmitted to English. All right. So those were the duties your client had. And I did read testimonial, but your client took the position that there was non- compliance in the very short time before the poor and he persisted in that. He knew it at the time. And there's also no evidence that he notified either of those people in writing. So we have a situation now where the district court relieved you of that responsibility because it found English was at fault. I don't necessarily agree that that was the district court's conclusion. And the district court said it was a level 2 violation, right? That is correct, Your Honor. The district court agreed that it was a level 2 non- conformity. And wasn't there a dispute on that? Well, that's unclear in the record. It's pretty clear. English said in its papers it was a level 3. In the argument that your colleague was arguing, it was a level 1 or 2. Correct. And English then took the position that it's at least a level 2 and started arguing the level 2. But its formal position in its papers was a level 3. Regardless of what people were arguing, everybody was arguing whether it's 1, 2, or 3. The consequences were different for those levels, right? That is correct. And so the question is what gets it to a level 3? What criteria? It's the nature of the defect and whether or not English has agreed to make corrections, is what would get you to a level 3. All right. We know English didn't agree to make corrections according to your man who said it was still out of conformity. Well, that's not exactly accurate. What the transcripts and the evidence and its undisputed below say is that our on-site inspector informed RK&K and English of concerns that at that point in time it was RK&K and English is responsible. And he didn't even make a note of it. He didn't write it to anybody. He didn't go above these people. He just sort of went ahead and I don't know what he did. I read his testimony. Well, the testimony is, and there's no dispute as to what happened to it, is that once RK&K and English met to determine how they were going to address the issues that had been raised, they made a decision on whether or not they conformed or not conformed, which we were not at party to. Again, we're the lowest level inspector out of the project and made the decision to proceed and were informed that at that point it was in conformance with what was required. And again, that... Well, how could you do that when your client testified it was not? Even as they poured, he knew it was not. Well, there was some discussion in the testimony about tolerance levels. There was also an ability in the testimony that the issue has to do with the screed level and rideability of the highway. There was argument between RK&K and English as to whether or not that the tolerances were allowed to be higher due to rideability issues and screed distance and the steel to allow this thing to be level so that appropriate travel passage could take place. And those arguments took place between RK&K and English. I know they took place before, but the question is you had an independent contractual duty to do something when you see something that you didn't agree with. And I couldn't find where you complied with a level three if that was the right level. And I think that's a disputed question. The question is shouldn't the jury decide whether it's a level two or three? Well, no, I don't agree. I don't think it is a level three nonconformity. I don't think there's evidence to suggest that there is. Well, for a couple of reasons. One, the issue with the level three nonconformity has to do with the severity and whether or not it could be corrected. It could have been corrected and English and it could   If it was too brief and too delayed time, they'd have to have a crane in there. They'd probably have to change those, what do you call those runners, the spacers? The slab runners. Slab runners. They'd either have to change those or make some kind of adjustment on those. They needed to achieve two and three quarters inches at the top. It depends on the dimensions of the rebar. It's the clearance issue. That's why I said two and three quarters inches of concrete above the rebar. Right, but there are other ways to get to that point. We were correcting the overall clearance and the overall distance between the top of the mat and what was going to ultimately be the top of the roadway on the 24th prior to the 4th. There's a document in the record, it's the dry run report, where in writing our inspector identified discrepancies and places where the deck did not conform to the specification. He provided them to RKNK and provided them to English. He never made a report of nonconformance. We didn't need to provide a report of nonconformance where English and RKNK met and decided that it was inconformance and they were going to proceed. Even if we had an obligation to provide an NCR, it never would have stopped this from taking place. NCRs weren't required to be produced until 24 hours after the nonconformance was identified. That's in section 4 of the QAQC plan. So the idea that this would have somehow stopped anything from proceeding when RKNK and English had made the decision to proceed. You really diminish your role. It seems to me you had an important role in this bridge and you diminish it down to you basically say it was KKR or English and you guys were sort of sitting on the side watching and making notes and calling into the newspapers or what. I don't know what your role was. I don't know about calling into the newspapers. But I do diminish our role and I diminish it for this reason. Our job was to go out and take measurements and to find out if the specifications were met. The other thing that I  I understand is that you think you have a duty to take some action. I don't know the specifics of that. I  that you are aware that  have been asked to take some action. But I don't know the specifics of that. I don't know the specifics of the issues at this time. And was responsible for the bridge, knew about these issues and was told specifically about the issues with the clearance. The other point for us is when we told R, K, the inspector has done something more than they did. The only entity that at that point in time could have done something more was R, K, and K who had authority contractually to stop the work. Well the district court relieved them a responsibility too. Well I'm not taking a position on whether or not R, K, and K should be removed from the contract. I don't know how to read them fully. I'd like to probably go to a monastery and read them for a week. That sounds like a relaxing venture. But this court's primary ruling with respect to us was that there was no genuine dispute that we did not materially breach any term in our contract. And there's been no allegation of error with respect to Article 11 in our subcontract. And frankly we don't have the same ambiguity language. So I don't know that that applies to us. The driving force in the district court's decision is we comply with all of our contractual obligations. And we contend that we did and there's no genuine material dispute. What is the contractual duty if it was a level 2? If it was a level 2 we had an obligation to inform the onsite foreman and RKNK and record it in our daily work schedule. When you say RKNK, did it have the name of an official? Well, the quality assurance manager who at the time was Richard Clark. Did that have to be in writing or could that be oral? We believe it could be in oral communication. You didn't say whether it was in writing or not. And that's in fact the evidence from below is that's in fact how the parties were proceeding with respect to this. If there's any other questions I'd be happy to answer and I realize I'm over my time but I would encourage the court we briefed many of these issues and I know Judge Neymar has already read them but many of these issues were addressed below and briefed extensively. I believe there's adequate information. Thank you Mr. Schmidt. All right Mr. Paul. Our request to this court is simple. Reverse the trial court and let these issues go to a jury to decide how to allocate the respective blame between the parties. What is your response to C.D.M. Schmidt's argument that this is clearly a level 2 violation and that they complied and there was no dispute of fact about that? I have several responses to that Your Honor. The first one I'll start with is this whole level structure deals with the QA plan not the QC plan. It's part 4 of this document that relates the duties that C.D.M. Schmidt has. It's part 3 that relates the duties that R.K. K. has. So I encourage the court to actually look at this. Tell me what C.D.M. Schmidt had a duty to do. Contractually. Contractually. I point you to page 1714 in the record which is part 4 which is the QC plan, subsection paragraph 4.9 noncompliant work corrective action. It says the QC.M. will immediately notify the construction manager if materials or workmanship do not comply with the specifications. Any quality issues or errors in this case. It continues on to say if the issues. Which part wasn't done? None of that was done. So you're saying there's no oral report. Not to the construction manager. That didn't require a written report. The diary. The diary is a written report. Wasn't there one diary? I'm sorry. I thought there was on April 21st a diary entry. There's a short note by the inspector not pointing out a deficiency in this area but saying to recheck generally the spacing. So there was a diary sheet but you think it was inadequate. But not that identifies an issue or deficiency. If the inspector believed that it was wrong, he had an obligation to say in writing on the 21st, this is wrong. You are not in conformity with the specifications. And he didn't. Okay. So I thought your argument was going to be he had to do it again on the 24th. He certainly did. He had obligations at both places. But you think he  on the 21st? I don't think he met his obligations on the 21st either. And I encourage the court to continue to read in section 4.9. If the issues or deficiencies cannot be resolved and everybody agrees that C.D.M. Smith didn't think the issues were resolved by April 24th, then they've got the obligation to do it again on the 24th. And that's what C.D.M. Smith has to do. The two sections are intended to connect to one another, but part 4 is the part that C.D.M. Smith prepares laying out their obligations. Part 3 is what C.D.M.  prepares laying out their obligations and they're  to marry up together. But the primary document regarding what C.D.M. Smith is supposed to do is part 4. Okay, except that, but we agree, part 3 also says a bunch about what C.D.M. Smith is supposed to do. It does. The district court thought it was marrying them up by sort of coming up with this analysis that the  1 is more specific and part 3 is more specific, governs as to level 1 and level 2, and on level 3 there's no inconsistency. I agree that's what the trial court did. I don't know that it was proper. We still think the jury should have been the one making those decisions, but I want to go back and address the second reason, I think you should just ignore these levels. That's because in part 3 the levels specifically assume that we have identified a problem that is actually being resolved. In fact, if you look at the specific language on page 2403 of the record that lays out the levels, all of them are operating under the assumption of we've identified a problem, we're in the process of fixing that problem. On April 24th, that's not what was happening. C.D.O. Smith knew that there was a nonconformity that wasn't getting fixed. That takes it outside that level structure and puts us directly into paragraph 4.9 when they know there's a problem that cannot be resolved. If all of the part 3 levels assume a problem is being corrected, does that mean that R.K. and K has no obligations if English just says we're not fixing it? So if there's a  not being corrected and this is the only part that governs R.K. and K's obligations with respect to a nonconformity, does that mean they have no obligations if it's not being fixed? I wouldn't say that was the only part of the whole plan that addresses R.K. and K's obligations. They've got other parts of that plan that talk about the need to inform VDOT and the need to report these other issues. But the structure that's put in place there is a structure to address things that everybody believes is being resolved. It's differentiating what you do when you can fix it that day, when you can fix it the next day. Can you just tell me where the part is about what R.K. and K. is supposed to do if it's not being fixed? I can't point you to that right now on the record, Judge. I'm sorry. Okay. All right. Anything else? No, I just ask that you allow us to go back to the jury and have the jury decide. All right. We'll come down to Greek Counsel and proceed on the
judges: Paul V. Niemeyer, Pamela A. Harris, Ellen L. Hollander